UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------X
                                 :

CEFERINO ANORA, JR.,                  :

                   Plaintiff,     :

                           :         19-cv-11732 (LJL)

     -v-                    :

                           :        OPINION AND ORDER

OASIS PROFESSIONAL MANAGEMENT GROUP,  :
LTD., MARISSA BECK, and RAMON AVENA,  :

                           :

              Defendants.    :

                           :
-------------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 03/01/2023

LEWIS J. LIMAN, United States District Judge:

      Plaintiff Ceferino Anora, Jr. ("Anora" or "Plaintiff") moves, pursuant to Federal Rule of

Civil Procedure 56, for summary judgment against defendants Oasis Professional Management

Group, Ltd. ("Oasis") and Marissa Beck ("Beck" and, together with Oasis, "Defendants").[1]  Dkt.

No. 66.  For the following reasons, the motion for summary judgment is denied.

## PROCEDURAL HISTORY

### I.    History

      On December 23, 2019, Plaintiff filed a *pro se* complaint ("Complaint") alleging that

Defendants and Ramon Avena ("Avena") violated the Forced Labor provision of the Trafficking

Victims Protection Reauthorization Act of 2003, 18 U.S.C. § 1589, and the Human Trafficking

provision of the Trafficking Victims Protection Reauthorization Act of 2003, 18 U.S.C. § 1590.

---

[1] Defendants attempted to cross-move for summary judgment.  *See* Dkt. No. 71.  However, as
described in detail below, Defendants' cross-motion was defective:  Although Defendants
submitted a memorandum of law in support of its cross motion for summary judgment, they did
not submit a motion for summary judgment as required by Local Rule 7.1 and did not timely file
a Local Rule 56.1 statement.  The Court thus denies Defendants' cross-motion for summary
judgment.

Dkt. No. 1.  On October 5, 2020, Avena moved to dismiss the Complaint against him for failure

to state a claim upon which relief could be granted, pursuant to Rule 12(b)(6) of the Federal

Rules of Civil Procedure.  Dkt. No. 17.  After the motion to dismiss became fully briefed on

November 18, 2020, *see* Dkt. Nos. 19, 26, 29, and after Miles Ashton, Plaintiff's attorney,

entered a notice of appearance on behalf of Plaintiff on October 21, 2020, Dkt. No. 21, the

parties stipulated that Plaintiff could amend his complaint, Dkt. No. 32.

Plaintiff filed an amended complaint ("Amended Complaint") on January 14, 2021, Dkt.

No. 35, and Avena requested that Magistrate Judge Kevin Fox, to whom the case was referred,

apply the fully briefed motion to dismiss to the Amended Complaint, Dkt. No. 34.  By Report

and Recommendation dated March 19, 2021, Magistrate Judge Fox recommended that the Court

grant Avena's motion and dismiss him from the case based on the papers submitted in

connection with the motion to dismiss the Complaint.  Dkt. No. 36.  The Court adopted

Magistrate Judge Fox's Report and Recommendation on August 31, 2021.  Dkt. No. 41.

Plaintiff filed a motion for summary judgment on May 23, 2022.  Dkt. No. 57.  This

motion was rejected because the supporting documents were not filed separately, with each

receiving its own docket number.  *Id.*; Entry on May 26, 2022.  Plaintiff refiled his motion for

summary judgment on June 3, 2022.  Dkt. No. 59.  Although the motion was properly filed, the

Rule 56.1 Statement, declarations, and memorandum of law in support were all rejected because

the wrong event type was selected.  *See* Dkt. Nos. 59–63.  Plaintiff again refiled his motion for

summary judgment, along with his Rule 56.1 Statement and supporting memorandum of law and

declarations on June 15, 2022.  Dkt. Nos. 65–69.  That same day, Defendants requested a

fourteen-day extension of time "to file our opposition to plaintiff's motion for summary

judgment cum defendants' own motion for summary judgment," Dkt. No. 64 at 1, which the

Court granted, Dkt. No. 70.  Fifteen days later, on June 30, 2022, Defendants filed a "memorandum of law in opposition to Plaintiff's motion for summary judgment and cross motion for summary judgment."  Dkt. No. 71 (cleaned up).  Defendants did not file either a notice of motion for summary judgment or a Local Rule 56.1 statement.

Plaintiff filed a reply memorandum of law in further support of his motion for summary judgment on July 8, 2022.  Dkt. No. 72.  In his reply, Plaintiff highlighted that Defendants failed to file a Rule 56.1 statement.  *Id.* at 1–2.  On July 13, 2022, without explanation, Defendants filed a Response to Plaintiff's Rule 56.1 Statement.  Dkt. No. 73 ("Rule 56.1 Counterstatement"). The Rule 56.1 Counterstatement was signed by Defendants' attorney Salvador E. Tuy and dated June 15, 2022.  *Id.* at 31.  Three days later, Defendants submitted a reply affirmation in opposition to Plaintiff's motion for summary judgment, Dkt. No. 74, to which Plaintiff replied on July 20, 2022, arguing that the Court should strike Defendants' untimely Rule 56.1 Counterstatement, Dkt. No. 75 ¶ 9.

## II.     Defendants' Cross-Motion for Summary Judgment and Rule 56.1 Counterstatement

As a threshold matter, the Court declines to consider Defendants' cross-motion for summary judgment and Rule 56.1 Counterstatement.  Under the Southern District of New York's Local Rule 7.1(a), "all motions shall include . . . [a] notice of motion . . . which shall specify the applicable rules or statutes pursuant to which the motion is brought, and shall specify the relief sought by the motion."  L.R. 7.1(a)(1).  "A moving party's failure to comply with Local Rule 7.1 is sufficient grounds to deny a motion."  *Anhui Konka Green Lighting Co., LTD. v. Green Logic LED Elec. Supply, Inc.*, 2021 WL 621205, at *1 (S.D.N.Y. Feb. 17, 2021); *see also Wight v. BankAmerica Corp.*, 219 F.3d 79, 85–86 (2d Cir. 2000) ("[I]t is the business of the district court to determine whether fairness demands that noncompliance [with the Local Rules] be excused." (citation omitted)).  Still, "[c]ourts in the Second Circuit have been reluctant to dismiss motions

for violating Local Rule 7.1(a)(1), reasoning that 'it would serve the interests of justice to resolve the motion . . . on the merits rather than on procedural deficiencies.'" *Anhui Konka Green Lighting Co.*, 2021 WL 621205, at *1 (quoting *Assets Recovery 23, LLC v. Gasper*, 2017 WL 3610568, at *4, *8 (E.D.N.Y. July 25, 2017)).  This discretion to excuse noncompliance with Local Rule 7.1, however, only extends so far; "the court has discretion to overlook a failure to comply with Local Rule 7.1 [only] where the movant submits 'a memorandum of law and supporting documents that allow the Court to consider the proposed motion.'" *Fiedler v. Incandela*, 222 F. Supp. 3d 141, 154–55 (E.D.N.Y. 2016) (alterations omitted) (quoting *Gigantino v. Turner Constr. Co.*, 2016 WL 5107062, at *1 n.1 (E.D.N.Y. Sept. 19, 2016)).

Here, Defendants submitted a "memorandum of law in opposition to Plaintiff's motion for summary judgment and cross motion for summary judgment." Dkt. No. 71 (cleaned up). From the memorandum, which was filed late, it is possible to glean the information required by Local Rule 7.1(a)(1):  it specifies the applicable rules pursuant to which the motion is brought and the relief sought (the granting of Defendants' cross motion for summary judgment). *See id.* at 31.  Thus, the memorandum might ordinarily excuse Defendants' failure to file a notice of motion. *See Fiedler*, 222 F. Supp. 3d at 155 ("Therefore, a motion need not be denied for failure to serve a Notice of Motion so long as the parties are 'fairly and adequately apprised of the nature and basis of the application.'" (citation omitted)).  However, Defendants did not submit all the supporting documents necessary for the Court to consider its cross-motion for summary judgment, because Defendants failed to submit a timely Local Rule 56.1 statement.

Local Civil Rule 56.1 sets forth specific requirements about how the facts relied upon by the moving party and disputed by the opposing party are to be presented.  Any party moving for summary judgment must "annex[] to the notice of motion a separate, short and concise

statement, in numbered paragraphs, of the material facts as to which the moving party contends there is no genuine issue to be tried." L.R. 56.1(a). "The requirement is strict; failure to submit a Rule 56.1 statement with a motion for summary judgment may result in the motion's denial." *T.Y. v. New York City Dep't of Educ.*, 584 F.3d 412, 417–18 (2d Cir. 2009); *see also* L.R. 56.1(a) ("Failure to submit such a statement may constitute grounds for denial of the motion."); *Suares v. Cityscape Tours, Inc.*, 603 F. App'x 16, 17 (2d Cir. 2015); *Antwi v. Health & Human Sys. (Centers) F.E.G.S.*, 2014 WL 4548619, at *4 (S.D.N.Y. Sept. 15, 2014) ("The failure to file a Rule 56.1 Statement is, on its own, grounds for denial of a motion for summary judgment.").

Defendants did not submit a Local Rule 56.1 statement with their memorandum of law. Only after Plaintiff alerted Defendants to their procedural violation, *see* Dkt. No. 72 at 1–2, and nearly a month after the deadline for Defendants' cross-motion for summary judgment, *see* Dkt. No. 70, did Defendants file their Rule 56.1 Counterstatement. Under Federal Rule of Civil Procedure 6(b)(1)(B), "the court may, for good cause, extend the time . . . on motion made after the time has expired if the party failed to act because of excusable neglect." Fed. R. Civ. P. 6(b)(1)(B). However, Defendants' Rule 56.1 Counterstatement was filed without any explanation, in the form of a motion or otherwise.[2] Because Defendants have not attempted to establish excusable neglect for its late-filed Rule 56.1 Counterstatement, the Court will not accept the untimely filing. *See Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 895–98, 896 n.5 (1990) (holding that district court did not abuse its discretion when rejecting late-filed

---

[2] In fact, Defendants' attorney attempted to obfuscate the late filing by backdating the Rule 56.1 Counterstatement to June 15, 2022, the date on which he filed Defendants' memorandum of law. *See* Dkt. No. 73 at 31. At this juncture, the Court deems this misstatement an inadvertent error and not a sanctionable attempt to mislead the Court. *See Romeo & Juliette Laser Hair Removal, Inc. v. Assara I, LLC*, 924 F. Supp. 2d 505, 507–08 (S.D.N.Y. 2013) (holding that a court, under its inherent powers, may sanction an attorney for "making of false and misleading statements to the Court").

evidentiary submissions at summary-judgment stage because the late filing was not accompanied by a motion, which "must contain a high degree of formality and precision, putting the opposing party on notice that a motion is at issue and that he therefore ought to respond"); *see also Gadsden v. Jones Lang Lasalle Americas, Inc.*, 210 F. Supp. 2d 430, 436 (S.D.N.Y. 2002). The Court thus denies Defendants' motion for summary judgment because of their failure to comply with Local Rule 7.1(a)(1) and to submit a Local Rule 56.1 statement.

By the same logic, the Court deems Plaintiff's Rule 56.1 Statement, Dkt. No. 65 ("Pl. 56.1") unopposed. Local Rule 56.1(b) requires the party opposing the motion to "include a correspondingly numbered paragraph responding to each numbered paragraph in the statement of the moving party, and if necessary, additional paragraphs containing a separate, short and concise statement of additional material facts as to which it is contended that there exists a genuine issue to be tried." L.R. 56.1(b). "Each numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party will be deemed to be admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in the statement required to be served by the opposing party." L.R. 56.1(c); *see T.Y.*, 584 F.3d at 418 ("A nonmoving party's failure to respond to a Rule 56.1 statement permits the court to conclude that the facts asserted in the statement are uncontested and admissible."). Because Defendants failed to timely file a Rule 56.1 statement, the Court deems the properly supported facts in Plaintiff's Rule 56.1 Statement admitted. *See Dung Nguyen v. Morrison Healthcare*, 412 F. Supp. 3d 196, 198 n.1 (E.D.N.Y. 2018) ("[T]he facts in Defendant's Rule 56.1 Statement are deemed admitted because Plaintiffs failed to file a timely Rule 56.1 Statement in opposition."); *Black v. USA Travel Auth. Inc.*, 2001 WL 761070, at *2 (S.D.N.Y. July 6, 2001) (same).

Although the Court deems Plaintiff's Rule 56.1 Statement unopposed, Plaintiff is not "absolve[d] . . . of the burden of showing that it is entitled to judgment as a matter of law." *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 74 (2d Cir. 2001).  This burden cannot be carried where the factual assertions contained in the Rule 56.1 statement either lack proper citations to the record or the cited portions of the record do not lend the necessary support.  *Id.*  Additionally, the "trial court has discretion to conduct an assiduous review of the record in an effort to weigh the propriety of granting a summary judgment motion."  *Monahan v. New York City Dep't of Corr.*, 214 F.3d 275, 292 (2d Cir. 2000) (citation omitted).  "If the evidence submitted in support of the summary judgment motion does not meet the movant's burden of production, then 'summary judgment must be denied *even if no opposing evidentiary matter is presented*.'"  *Vermont Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004) (emphasis in original) (citation omitted).

## BACKGROUND

### I.    Factual Background

The following facts are drawn primarily from Plaintiff's unopposed Local Rule 56.1 Statement.

Anora is a citizen of the Republic of the Philippines who entered the United States in October 2015 on a B-1 visa.  Pl. 56.1 ¶ 1; Dkt. No. 67 ¶ 2.  He is a physical therapist, licensed in New York.  Pl. 56.1 ¶¶ 2–3.  Oasis is a New York corporation that provides health care staffing services, including physical-therapy staffing services, to health care facilities in New York.  *Id.* ¶¶ 4–5.  Beck is Oasis's managing director.  *Id.* ¶ 6.

On May 10, 2016, an Oasis employee responded to an inquiry from Anora about a physical-therapy position with Oasis.  *Id.* ¶ 13.  Two weeks later, on or about May 23, 2016, Defendants sent Plaintiff an offer of employment ("Employment Agreement").  *Id.* ¶ 14.  The

Employment Agreement was for a term of three years at "the prevailing wage for the position as determined by the" Occupational Employment and Wage Statistics of the U.S. Bureau of Labor Statistics.  Dkt. No. 68-5 §§ 1, 5.  The contract, however, only came into "full force and effect only upon the approval by the Department of Homeland Security of the employee's [immigration] petition" and was "valid" only if "signed by the employee and a Company's authorized representative."  *Id.* § 18.  Anora signed and returned the contract; it is unclear from the record whether Oasis, through its president Beck, countersigned the contract.  Pl. 56.1 ¶ 11; Dkt. No. 68-5 at ECF p. 6.  Around the same time, Defendants also promised Plaintiff that he would be paid at least the prevailing wage rate.  Pl. 56.1 ¶¶ 15, 17 (citing Dkt. No. 67 ¶¶ 7, 9).[3] Plaintiff accepted his first assignment from Defendants on June 30, 2016, at Innovative Physical Medicine in Mount Vernon, New York.  *Id.* ¶ 23.  Plaintiff was initially paid $27 per hour in cash, but the Employment Agreement claimed that the prevailing wage rate was $32 per hour. *Id.* ¶¶ 21, 23, 51.

On or about October 20, 2016, Defendants filed a Form I-140, Immigration Petition for Alien Worker ("Form I-140 Petition") on behalf of Plaintiff.  *Id.* ¶ 25.  A Form I-140 Petition is

---

[3] Plaintiff's Rule 56.1 Statement also cites to the Amended Complaint and Answer to support this contention; neither citation is cognizable.  The Amended Complaint, which is signed by Plaintiff's attorney and not by Plaintiff is not a verified complaint cognizable on summary judgment.  *See Monahan*, 214 F.3d at 292 ("[A] verified complaint may serve as an affidavit for summary judgment purposes provided it meets the other requirements for an affidavit under Rule 56[(c)(4)].");  *Caro Cap., LLC v. Koch*, 2023 WL 1103668, at *16 (S.D.N.Y. Jan. 30, 2023) ("It is blackletter law that an unverified complaint is not evidence that can be relied upon at summary judgment.").  Similarly, although judicial admissions are cognizable on summary judgment, *see Gibbs ex rel. Est. of Gibbs v. CIGNA Corp.*, 440 F.3d 571, 578 (2d Cir. 2006) ("Facts admitted in an answer, as in any pleading, are judicial admissions that bind the defendant throughout this litigation.");  Fed. R. Civ. P. 56(c)(1)(A) ("A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record, including . . . admissions . . . ."), Defendants do not admit that they agreed to pay the prevailing wage rate at any point prior to the approval of Plaintiff's EB-2 visa, *see* Dkt. No. 35 ¶¶ 38, 41.

filed by a prospective employer to request that a noncitizen worker become a permanent resident, including through an EB-2 visa. *See Schwebel v. Crandall*, 343 F. Supp. 3d 322, 324 (S.D.N.Y. 2018), *aff'd*, 967 F.3d 96 (2d Cir. 2020); *I-140, Immigrant Petition for Alien Workers*, https://www.uscis.gov/i-140 (last updated Jan. 12, 2023). When Defendants filed the Form I-140 Petition, Beck declared that they would pay "at least the prevailing wage." Dkt. No. 68-6 at ECF p. 16. In connection with the filing of the Form I-140 Petition, Avena—an immigration lawyer for Defendants and their employees, Pl. 56.1 ¶¶ 9–10—requested a prevailing wage determination from the U.S. Department of Labor for Plaintiff's position, *id.* ¶ 26. The prevailing wage for Plaintiff's position was $79,581 per year or $38.26 per hour. *Id.* ¶¶ 28, 30. On October 20, 2016, Plaintiff, with Avena's assistance, filed a Form I-485, Application for Adjustment of Status to Lawful Permanent Resident ("Form I-485 Application"), which "adjusts" an immigrant's status to that of legal permanent resident once a visa becomes available through the approval of a Form I-140 Petition. *Id.* ¶¶ 32, 45; *Schwebel*, 343 F. Supp. 3d at 324; *Become a Lawful Permanent Resident (Green Card Holder) Through a Job Offer*, https://www.uscis.gov/forms/explore-my-options/become-a-lawful-permanent-resident-green-card-holder-through-a-job-offer (last updated Dec. 16, 2020).

On September 27, 2017, the United States Citizenship and Immigration Services ("USCIS") denied Oasis's Form I-140 Petition because the Form I-140 Petition was prematurely submitted and the notice of filing related to the application listed an incorrect foreign labor certification processing location. Pl. 56.1 ¶ 34; Dkt. No. 68-9 at ECF p. 4. As a result, Plaintiff's Form I-485 Application was automatically denied. Pl. 56.1 ¶¶ 36–37. Nearly a year before the Form I-140 Petition and Form I-485 Application were denied, on October 21, 2016, Plaintiff's nonimmigrant B-1 visa had expired. *Id.* ¶ 38. Defendants assured Plaintiff that he

could continue working for them because his Employment Authorization Document ("EAD"), which was issued in December 2016, was still valid. *Id.* ¶¶ 40, 43, 54. Defendants advised Plaintiff that the Form I-140 Petition and Form I-485 Application should be refiled, and Plaintiff agreed. *Id.* ¶¶ 41–42, 46. The Form I-140 Petition and Form I-485 Application were refiled on December 11, 2017. *Id.* ¶¶ 47, 49. From July 1, 2017, through June 30, 2018, the prevailing wage was $81,058 per year or $38.97 per hour. *Id.* ¶ 48.

During the time when his permanent status immigration papers were outstanding, Plaintiff worked for Oasis at various physical therapy clinics, based on work placements and schedules assigned by Defendants, and he consistently made less than the prevailing wage rate. *See id.* ¶¶ 12, 50–58. From June 2016 through December 2016, Anora was paid $27 per hour in cash. *Id.* ¶ 51. When Plaintiff asked why he was only getting paid $27 per hour, Defendants responded that he had not yet received his EAD. *Id.* ¶ 52. Once his EAD was issued in December 2016, he received a pay increase to $31.61 per hour and was put on Oasis's payroll. *Id.* ¶ 54. During Plaintiff's employment with Oasis, he never received more than $31.61 per hour, although the prevailing wage rate was always above this level. *See id.* ¶¶ 21, 30, 58.

Suspicious that he was making less than the prevailing wage rate, Plaintiff confronted Defendants in April 2018 and demanded to see copies of the prevailing wage determination and Form I-140 Petition. *Id.* ¶ 59. Plaintiff again requested to see copies of the Form I-140 Petition in August and September 2018 so that "he could check how much Defendants promised the USCIS they should be paying him." *Id.* ¶ 62. Defendants refused to show Plaintiff the Form I-140 Petition and, on at least three occasions, Oasis's physical-therapy coordinator Alwin Ilaga ("Ilaga") yelled at Plaintiff on the phone and told him he was being difficult. *Id.* ¶¶ 60–61, 63. Ilaga assured Plaintiff that he was getting paid at the prevailing wage rate. *Id.* ¶ 64.

From September 15, 2018, through October 2, 2018, Plaintiff refused to take on new work assignments or to respond to Defendants' calls. *Id.* ¶¶ 65–66.  On September 28, 2018, Defendants received a request for evidence ("RFE") from the USCIS in connection with Plaintiff's Form I-140 Petition.  *Id.* ¶ 67; Dkt. No. 68-14 at ECF p. 2.  That same day, Ilaga wrote to Plaintiff telling him that "USCIS issued an RFE for your case" and informed him that "Mrs. Beck said the company will not respond to the RFE if we didn't hear anything from you." Pl. 56.1 ¶ 68.  Plaintiff, fearful that Defendants might not respond to the RFE, called Ilaga, who told him that Defendants would withdraw his immigration sponsorship if Plaintiff continued to refuse to take on new assignments and to complain about his hourly wages.  *Id.* ¶¶ 69–70. Plaintiff resumed working for Defendants because he was afraid that they would withdraw his immigration sponsorship or would refuse to respond to the RFE, resulting in a denial of the Form I-140 Petition.  *Id.* ¶¶ 71–75.

Defendants submitted a response to the RFE on November 28, 2018, and USCIS approved the second Form I-140 Petition on January 24, 2019.  *Id.* ¶¶ 77–78.  However, Plaintiff's second Form I-485 Application was denied because Plaintiff "had been out of legal status from the expiration of [his] B-1 visa on 10/21/2016 until [he] filed [his] Form I-485" Application in December 2017, which was in excess of the 180 days maximum.  *Id.* ¶ 79 (quoting Dkt. No. 68-18 at ECF p. 4).  Plaintiff claims that he continued to work for Defendants because of the promise that he would receive a green card, despite the fact that they "knew" that Plaintiff's application would be denied.  *Id.* ¶¶ 80–87.  Plaintiff emailed Defendants and Avena several times asking why they caused Plaintiff to re-file his immigration application, despite knowing that it would be denied.  *See id.* ¶¶ 88, 90, 92–94.  Beck only responded to one of these emails, telling Plaintiff to stop his complaining and to meet her on Monday afternoon.  *See id.*

¶¶ 89, 91, 95.  The record is silent as to whether the Monday meeting occurred and, if it did, what was discussed.

## II.      Statutory Overview

Congress enacted the Trafficking Victims Protection Act of 2000 ("TVPA"), Pub. L. No. 106–386, 114 Stat. 1464, in response to the Supreme Court's decision in *United States v. Kozminski*, 487 U.S. 931 (1988), which narrowly defined "involuntary servitude" as "compulsion . . . through physical or legal coercion," *id.* at 952.  *See United States v. Dann*, 652 F.3d 1160, 1169 (9th Cir. 2011).  The TVPA was designed "to reach cases in which persons are held in a condition of servitude through nonviolent coercion."  22 U.S.C. § 7101(b)(13). Specifically, the TVPA added 18 U.S.C. § 1589 "to address the increasingly subtle methods of traffickers who place their victims in modern-day slavery, such as where traffickers threaten harm to third persons, restrain their victims without physical violence or injury, or threaten dire consequences by means other than overt violence" and to "to combat severe forms of worker exploitation that do not rise to the level of involuntary servitude as defined in *Kozminski*."  H. R. Rep. No. 106-939, at 101, 2000 U.S.C.C.A.N. 1380, 1392–93 (2000) (Conf. Rep.); *see also Franco v. Diaz*, 51 F. Supp. 3d 235, 247 (E.D.N.Y. 2014) ("The [TVPA] does not require that plaintiffs be kept under literal lock and key.").  Section 1589 imposes criminal liability on any person "who[] knowingly provides or obtains the labor or services of a person by any one of, or by any combination of, the following means":

> (1) by means of force, threats of force, physical restraint, or threats of physical restraint to that person or another person;
>
> (2) by means of serious harm or threats of serious harm to that person or another person;
>
> (3) by means of the abuse or threatened abuse of law or legal process; or

(4) by means of any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint.

18 U.S.C. § 1589(a).  The TVPA also created criminal liability for any person "who[] knowingly recruits, harbors, transports, provides, or obtains by any means, any person for labor or services in violation of this chapter," including in violation of Section 1589.  *Id.* § 1590(a).

In 2003, Congress amended the TVPA to include a private right of action, which was amended in 2008.  *See Nestle USA, Inc. v. Doe*, 141 S. Ct. 1931, 1939 (2021) (first citing Pub. L. 108-193 (Trafficking Victims Protection Reauthorization Act of 2003), § 4(a)(4)(A), 117 Stat. 2875, 2878, then citing Pub. L. No. 110-457, §§ 221, 222(b)(3), 122 Stat. 5044, 5067–68).  As codified, Section 1595 permits an "individual who is a victim of a violation of this chapter [including Sections 1589 and 1590] [to] bring a civil action against the perpetrator (or whoever knowingly benefits, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of this chapter)."  18 U.S.C. § 1595(a).

As relevant here, Plaintiff seeks damages through Section 1595 under both Sections 1589 and 1590 of the TVPA.

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 56, a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "An issue of fact is 'material' for these purposes if it 'might affect the outcome of the suit under the governing law,'" while "[a]n issue of fact is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"  *Konikoff v. Prudential Ins. Co. of Am.*, 234 F.3d 92, 97 (2d Cir. 2000) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  In determining whether

there are any genuine issues of material fact, the Court must view all facts "in the light most favorable to the non-moving party," *Holtz*, 258 F.3d at 69, and the movant bears the burden of demonstrating that "no genuine issue of material fact exists," *Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 286 (2d Cir. 2002) (citations omitted).  If the movant meets its burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment."  *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008).

"[A] party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment."  *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (quoting *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1456 (2d Cir. 1995)).  Nor may the non-moving party "rely on conclusory allegations or unsubstantiated speculation."  *F.D.I.C. v. Great Am. Ins. Co.*, 607 F.3d 288, 292 (2d Cir. 2010) (quoting *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998)).  Rather, to survive a summary judgment motion, the opposing party must establish a genuine issue of fact by "citing to particular parts of materials in the record."  Fed. R. Civ. P. 56(c)(1)(A); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009).  The non-moving party must also demonstrate more than "some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  The non-moving party "cannot defeat the motion by relying on the allegations in [its] pleading, or on conclusory statements, or on mere assertions that affidavits supporting the motion are not credible."  *Gottlieb v. Cnty. of Orange*, 84 F.3d 511, 518 (2d Cir. 1996) (internal citation omitted).

As described above, the Southern District's Local Civil Rule 56.1 sets forth the requirements about how the facts relied upon by the moving party and disputed by the opposing

14

party are to be presented.  All statements in a Local Rule 56.1 submission "must be followed by citation to evidence which would be admissible."  L.R. 56.1(d).  "Each numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party will be deemed to be admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in the statement required to be served by the opposing party."  L.R. 56.1(c).

## DISCUSSION

Plaintiff argues that he is entitled to judgment as a matter of law on his Section 1589 claim because Defendants' threats to not respond to the RFE and to withdraw their sponsorship of his Form I-140 Petition constitute "threats of serious harm" under Section 1589(a)(2) and a "scheme" that caused him to believe he would suffer serious harm under Section 1589(a)(4).  Dkt. No. 69 at 16–19.  He further argues that he is entitled to summary judgment on his Section 1589 claim because Defendants abused the legal process as proscribed by Section 1589(a)(3) by re-filing his Form I-485 Application solely "so that Anora would continue to work for Defendants" and not "to secure Anora's green card."  *Id.* at 21.  Defendants counter that Plaintiff has only presented hearsay evidence to support his claim, that the threat to withdraw sponsorship was not a threat of "serious harm," and, in a conclusory fashion, that there was no abuse of the immigration process.  Dkt. No. 71 at 20–21, 23–24.  Plaintiff further argues that summary judgment is appropriate for his Section 1590 claim because Defendants "provided" Plaintiff's labor at health care facilities in connection with their violation of Section 1589, Dkt. No. 69 at 21–22, an argument that Defendants challenge as unsupported by sufficient evidence, Dkt. No. 71 at 29.

The Court concludes that Plaintiff is not entitled to summary judgment on either claim.

I.      **Forced Labor Claims under 18 U.S.C. § 1589**

Plaintiff argues that he is entitled to judgment as a matter of law on his Section 1589

claim because Defendants' threats to withdraw their sponsorship constituted serious harm under

subsections (a)(2) and (a)(4) and because the re-filing of his Form I-485 Application was an

abuse of the legal process under subsection (a)(3). The Court addresses each argument in turn.

A.      **Section 1589(a)(2), (a)(4)**

"[N]ot all bad employer-employee relationships . . . will constitute forced labor." *Dann*,

652 F.3d at 1170. To distinguish between bad employer-employee relationships and forced

labor, Section 1589 requires that the harm used as a means to obtain labor or services be

"serious." 18 U.S.C.§ 1589(a)(2). In turn, "serious harm" is defined as "any harm, whether

physical or nonphysical, including psychological, financial, or reputational harm, that is

sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of

the same background and in the same circumstances to perform or to continue performing labor

or services in order to avoid incurring that harm." *Id*. § 1589(c)(2). The Second Circuit applies

a "hybrid" standard to determine whether the threatened harm is "sufficiently serious to coerce a

plaintiff to provide labor against her will." *Hongxia Wang v. Enlander*, 2018 WL 1276854, at *5

(S.D.N.Y. Mar. 6, 2018). This standard "'consider[s] the particular vulnerabilities of a person in

the victim's position but . . . her acquiescence [must] be objectively reasonable under the

circumstances,' taking into consideration whether 'a reasonable person of the same background

and circumstances would have also felt coerced.'" *Id.* (quoting *United States v. Rivera*, 799 F.3d

180, 186–87 (2d Cir. 2015)); *see also Muchira v. Al-Rawaf*, 850 F.3d 605, 618 (4th Cir. 2017),

*as amended* (Mar. 3, 2017) (adopting the Second Circuit's hybrid standard).

Because "a victim has fewer means of escape where the threats in her case involve

immigration," *Dann*, 652 F.3d at 1172, courts have "found that the threat of deportation alone

16

may support a claim for forced labor," *Akhtar v. Vitamin Herbal Homeopathic Ctr. Inc.*, 2021 WL 7186030, at *8 (E.D.N.Y. Apr. 30, 2021) (collecting cases); *see also Adia v. Grandeur Mgmt., Inc.*, 933 F.3d 89, 93 (2d Cir. 2019) (finding that "a threat to expose [plaintiff] to deportation" can constitute serious harm); *United States v. Kalu*, 791 F.3d 1194, 1212 (10th Cir. 2015) (finding that threats that immigrant nurses' visas would be revoked and that they would be deported and financially ruined were sufficient to constitute threats of serious harm under the TVPA); *United States v. Rivera*, 2012 WL 2339318, at *5–6 (E.D.N.Y. June 19, 2012), *aff'd*, 799 F.3d 180.  Still, "[t]ypically . . . 'forced labor' situations involve" more than just threats of deportation.  *Muchira*, 850 F.3d at 618.  They often involve some combination of "circumstances such as squalid or otherwise intolerable living conditions, extreme isolation (from family and the outside world), threats of inflicting harm upon the victim or others (including threats of legal process such as arrest or deportation), and exploitation of the victim's lack of education and familiarity with the English language, all of which are 'used to prevent [vulnerable] victims from leaving and to keep them bound to their captors.'"  *Id.* at 618–19 (quoting *United States v. Callahan*, 801 F.3d 606, 619 (6th Cir. 2015)) (citing, *inter alia*, *Rivera*, 799 F.3d at 183); *cf. Elat v. Ngoubene*, 993 F. Supp. 2d 497, 525 (D. Md. 2014) (collecting cases) ("[I]n the majority of the cases in which the plaintiffs alleged threats of deportation in a TVPRA claim . . . , the courts noted that the defendants made multiple threats of deportation, often accompanied by threats of other harm, and/or threatened to take action to have the plaintiffs deported.").

Relying on this line of cases, Plaintiff argues that Defendants' actions constituted a threat that he would be deported and thus suffered serious harm under the forced labor statute.  *See* Dkt. No. 69 at 20.  In September 2018, Plaintiff ignored phone calls from Oasis's employee and refused to accept new work assignments from Oasis.  Pl. 56.1 ¶¶ 65, 66.  As a result, Defendants

17

threatened to ignore USCIS's RFE and to withdraw his immigration sponsorship.[4]  Pl. 56.1

¶¶ 68, 71.  Because Plaintiff's "B-1 visa . . . had expired as of October 21, 2016," he "grudgingly

accepted and took the new assignments given to him by Defendants" so that his "immigration

sponsorship [would be] filed and approved so he would not become unlawfully present and be

put in deportation or removal proceedings."  Dkt. No. 69 at 17, 20.  Defendants counter that

neither statement "threatened Plaintiff with deportation."  Dkt. No. 71 at 20.

        Defendants' argument that they never actually threatened Plaintiff with deportation, and

thus as a matter of law Defendants cannot be liable under the forced-labor statute, is meritless.

Courts have found that a plaintiff need not be "explicitly threatened [with] deportation."  *See*

*Dann*, 652 F.3d at 1172 (finding that repeated threats that a victim would be forced to leave the

United States was sufficient to "constitute serious harm to an immigrant").  It is enough that, in

context and "based on the surrounding circumstances," a reasonable jury could find that the

plaintiff was "entitled to regard [the statement] as a threat to expose him to deportation."  *Adia*,

933 F.3d at 93.  As the Second Circuit has found, threats to withdraw immigration sponsorship

can be sufficient to constitute serious harm.  *Id.* ("The defendants' threat that they would

withdraw sponsorship could plausibly understood as a scheme [under Section 1589(a)(4)] to

---

[4] Defendants argue that both of these statements are inadmissible hearsay.  However, this
argument misunderstands the hearsay exclusion.  While it is true that the Court cannot consider
hearsay statements on summary judgment, *see Abdel-Karim v. EgyptAir Airlines*, 116 F. Supp.
3d 389, 409 (S.D.N.Y. 2015), *aff'd*, 649 F. App'x 5 (2d Cir. 2016) ("A party 'cannot rely on
inadmissible hearsay in opposing a motion for summary judgment . . . absent a showing that
admissible evidence will be available at trial.'" (citation omitted)), neither statement is coming in
for the truth of the matter asserted.  It is irrelevant whether Defendants actually intended not to
respond to the RFE or to withdraw Plaintiff's sponsorship; rather, both are offered to show the
fact of the threats and the effect on the listener, specifically that Plaintiff feared immigration
consequences if he did not continue working for Oasis.  *See United States v. Dupree*, 706 F.3d
131, 136 (2d Cir. 2013) ("[A] statement offered to show its effect on the listener is not
hearsay.").  In any event, both are opposing party statements admissible under Federal Rule of
Evidence 801(d)(2).

convince [plaintiff] that he would be harmed by deportation if he left or asked for overtime pay."). However, "courts 'must distinguish between improper threats or coercion and permissible warnings of adverse but legitimate consequences.'" *Walia v. Veritas Healthcare Sols., L.L.C.*, 2015 WL 4743542, at *4 (S.D.N.Y. Aug. 11, 2015) (quoting *Headley v. Church of Scientology Int'l*, 687 F.3d 1173, 1180 (9th Cir. 2012)); *see also United States v. Bradley*, 390 F.3d 145, 151 (1st Cir. 2004), *judgment vacated on other grounds*, 545 U.S. 1101 (2005) ("Taken literally, Congress' 'threats' and 'scheme' language could be read to encompass conduct such as the employer's 'threat' not to pay for passage home if an employee left early. Depending upon the contract, surely such a 'threat' could be a legitimate stance for the employer and not criminal conduct."). Here, there is a question of fact whether Defendants' actions were warnings of legitimate consequences. Section 6 of the Employment Agreement between Oasis and Plaintiff governs Oasis's obligations to assist Plaintiff in securing permanent status. *See* Dkt. No. 68-5 § 6. That section provides that "the Company's obligations under this Agreement to provide immigration assistance to the Employee ends if the Company terminates the Employee prior to the end of this Agreement's Term at the time of termination of Employee's employment." *Id.* Similarly, that section makes the employee responsible for "all legal costs and all other related costs incurred in the petition" if the employee "cancel[s] the Employment Agreement for whatever reason while the Sponsorship Petition filed on his / her behalf is still being processed." *Id.* § 6(b); *see also id.* § 10(a) ("The Employee acknowledges that the Immigration Assistance as set forth herein is of great value and represents a significant cost to the Company."). The Employment Agreement thus contemplates Defendants' immigration assistance continuing only so long as Plaintiff worked for Oasis. Defendants' statement that they would not respond to the RFE came after and in the context of Plaintiff's failure to respond to

Defendants' phone calls and refusal to accept new work assignments.  Pl. 56.1 ¶¶ 65–66.

Viewed in the light most favorable to the Defendants, as this Court must do, there is a question

of fact as to whether Defendants' threats not to respond to the pending RFE and to withdraw his

sponsorship were "permissible warnings of adverse but legitimate consequences" under the

Employment Agreement if Plaintiff terminated his employment with Oasis.  *See DeSilva v. N.*

*Shore-Long Island Jewish Health Sys., Inc.*, 2012 WL 748760, at *7 (E.D.N.Y. Mar. 7, 2012)

(Bianco, J.) (holding that threats to fire at-will employees and berating them in public "would

merely be threats of adverse but legitimate consequences, and such threats do not constitute

forced labor"); *cf. Paguirigan v. Prompt Nursing Emp. Agency LLC*, 2019 WL 4647648, at *17

(E.D.N.Y. Sept. 24, 2019), *aff'd in part, appeal dismissed in part*, 827 F. App'x 116 (2d Cir.

2020) (finding that liquidated damages provision in employment agreement was sufficient to

constitute serious harm under the TVPA because it was unenforceable); *cf. also Baldia v. RN*

*Express Staffing Registry LLC*, 2022 WL 4777836, at *8–9 (S.D.N.Y. Oct. 3, 2022) (same);

*Hemant Patel, M.D., P.C. v. Bandikatla*, 2021 WL 4254977, at *4 (S.D.N.Y. Sept. 17, 2021)

(denying counterclaim plaintiff's motion for summary judgment on TVPA counterclaims based

on initiation of a lawsuit because lawsuit was "arguably based on a legitimate employment

contract issue").

There is a further factual question whether Plaintiff did understand and could reasonably

have understood Defendants' actions to expose him to deportation.  There is evidence that, at the

time that Defendants threatened to withdraw his sponsorship, Plaintiff believed that he was

legally entitled to remain in the United States, even if the Form I-140 Petition was withdrawn.

Plaintiff had a valid, unexpired EAD, authorizing him to work in the United States.  *See* Dkt.

No. 68-19[5] (indicating that EAD expired in May 2020).  Further, Defendants had led Plaintiff to

believe when his first Form I-140 Petition and Form I-485 Application were denied that he could

"continue working for them because he . . . still had a valid EAD or work permit card."  Pl. 56.1

¶ 40.  Thus, viewing the evidence in the light most favorable to the non-moving party, a

reasonable jury could conclude that Plaintiff—who by his own admission knew little about

immigration law and relied on Defendants' and Aveno's assurances, *see id.* ¶¶ 46, 85–86—did

not view deportation as the direct consequence of Defendants' withdrawal of their sponsorship.

In fact, Plaintiff's own declaration suggests that he was primarily worried that he would not

receive a green card if he did not return to work; he declared, "I resumed services for

Defendants . . . because I did not want my immigration sponsorship to be adversely affected,

which would then result to my not getting a green card, or worse, to my being deported from the

United States."  Dkt. No. 67 ¶ 53.  It is a question of fact as to whether Plaintiff understood these

communications to be threats of deportation, and thus whether they constituted threats of serious

harm under the forced labor statute.[6]

---

[5] Although it is unclear from the record whether this was the same EAD that was valid in
October 2018, or a renewed one, there is no evidence in the record or suggestion that Plaintiff
did not have a valid EAD when Defendants' threats were made.

[6] Plaintiff appears to suggest that the Second Circuit's decision in *Adia v. Grandeur
Management, Inc.*, 933 F.3d 89, held that threatening to withdraw immigration sponsorship can
*ipso facto* constitute a threat of deportation.  *See* Dkt. No. 69 at 17–18.  However, *Adia* arose on
a motion to dismiss where the court held that plaintiff was not required to plead specific facts,
*see Adia*, 933 F.3d at 91 (quoting *Erickson v. Pardus*, 551 U.S. 89, 93 (2007)), and it involved a
different visa scheme than the one at issue here, H-2B visas, which were linked to specific
employers, *see* Exercise of Time-Limited Authority To Increase the Numerical Limitation for
Second Half of FY 2022 for the H-2B Temporary Nonagricultural Worker Program and
Portability Flexibility for H–2B Workers Seeking To Change Employers, 87 Fed. Reg. 30334,
30349–51 (May 18, 2022) (codified at 8 C.F.R. pts. 214, 274a) (suggesting that the Secretary of
Homeland Security first exercised authority to make H-2B visas portable in fiscal year 2022).
Thus, the statement from the plaintiff's employer in *Adia* that it would withdraw its sponsorship
of his visa, which would automatically end his eligibility to remain in the United States, when
"viewed in the light of the surrounding circumstances, plausibly supports an inference that [the

Plaintiff's argument, interpreted generously, can also be construed to suggest that Defendants' threats could not have been permissible warnings of legitimate consequences as a matter of law because Defendants were at all times paying Plaintiff below the agreed-upon prevailing wage rate and thus Plaintiff's refusal to accept new job responsibilities was justified. *See* Dkt. No. 69 at 16.  To the degree Plaintiff is making this argument, it finds some support in the case law.  *See Walia*, 2015 WL 4743542, at *4 (holding that threat to revoke H-1B visa was not a permissible warning because "Plaintiff has alleged that the work he was made to perform transcended the satisfaction of his legitimate job duties"); *Javier v. Beck*, 2014 WL 3058456, at *6 (S.D.N.Y. July 3, 2014) (finding, in a case brought against Beck and Oasis, among others, that courts must consider "the context of the threat" and concluding that plaintiff sufficiently pled a claim under the TVPA because after "promis[ing] him a job as a physical therapy rehab manager paying $35.53 per hour, [defendants] threatened to withdraw his visa application if he did not report to other jobs where he effectively earned $15 per hour").  Though it is undisputed by the parties that Plaintiff was at all times paid an amount below the prevailing wage rate, *see* Pl. 56.1 ¶¶ 21, 30, 58, it is a question of fact whether Plaintiff was entitled to be paid the prevailing wage rate.  Plaintiff offers three pieces of evidence that he argues shows that he was underpaid.  First, he points to the Employment Agreement, which he claims set his compensation at the then-prevailing wage rate of $32 per hour.  *Id.* ¶¶ 20–21, 96.  Second, Plaintiff points to the Form I-140 Petition, where Defendants certified that they would pay Plaintiff at least the

---

plaintiff] was entitled to regard it as a threat to expose him to deportation" at the motion-to-dismiss stage.  *Adia*, 933 F.3d at 93.  However, Plaintiff here had an EAD, which is valid until expiration unless separately revoked, *see* 8 CFR § 274a.14(b), and there is evidence to suggest that he thought he could work so long as his EAD was unexpired.  *See* Pl. 56.1 ¶ 40.  Thus, the surrounding circumstances raise an issue of fact as to whether Plaintiff viewed Defendants' threats as tantamount to threats of deportation or instead as impediments to him receiving a green card.

prevailing wage rate.  *Id.* ¶ 24.  Finally, Plaintiff points to statements from Oasis's agents concerning the prevailing wage rate.  Around the time that Plaintiff signed the Employment Agreement, Beck and Oasis's officers promised Plaintiff that he would receive the prevailing wage rate.  *Id.* ¶¶ 15, 17.  And when Plaintiff demanded to see copies of the Form I-140 Petition in August 2018 and September 2018 to confirm that he was receiving the prevailing wage rate, Ilaga assured him that he was, while refusing to show him the paperwork.  *Id.* ¶ 64.

This evidence, however, does not support the proposition that Plaintiff was unquestionably entitled to the prevailing wage rate during his employment.  First, under the Employment Agreement, Defendants' obligation to pay Plaintiff the prevailing wage rate appears to come into effect only after his Form I-140 Petition was approved.  The Salary provisions in Section 5 of the Employment Agreement were effective only during the "Term" of the Employment Agreement.[7]  Dkt. No. 68-5 § 5.  The "Term of Employment" is defined as "a period of three (3) years which shall commence on the date the Employee first render[s] actual services to the company subject to the provisions of [Section] 19 hereof."  *Id.* § 1.  The reference to Section 19, which defines the governing law of the agreement, is arguably a typographical error; Section 18 defines the validity of the contract, which "shall be in full force and effect only upon the approval of the Department of Homeland Security of the employee's petition."  *See id.* §§ 18–19.  Similarly, the promises that Beck and Oasis's officers made to Plaintiff concerning the prevailing wage rate appear to have been made in connection with the Employment Agreement.  *See* Pl. 56.1 ¶ 14; Dkt. No. 67 ¶ 6.  It is thus unclear—that is, it is a disputed issue of fact—whether Defendants promised Plaintiff that he would be compensated at the prevailing

---

[7] In contrast, the immigration provisions of the Employment Agreement took effect at the "execution of this Agreement," not the approval of Plaintiff's Form I-140 Petition.  *See* Dkt. No. 68-5 § 6.

wage rate *before* the Employment Agreement took effect or only after the Employment

Agreement was effective upon the approval of his Form I-140 Petition.  Finally, Defendants'

certification in the Application for Permanent Employment Certification (ETA Form 9089) that

was filed with the Form I-140 Petitions, stated that Oasis "*will* pay at least the prevailing wage."

*See* Dkt. No. 68-6 at ECF p. 16 (emphasis added); *see also* 20 C.F.R. § 656.10(c)(1).  Thus,

construing the facts in favor of the non-moving parties, Plaintiff was only entitled to the

prevailing wage under these certifications after he became a permanent resident.  *See Baiju v.

U.S. Dep't of Lab.*, 2014 WL 349295, at *10 (E.D.N.Y. Jan. 31, 2014) ("[U]nder the permanent

employment program, a foreign employee is not entitled to the [prevailing] wage rate until he

receives a permanent residency visa, commonly known as a 'green card,' from USCIS."); *In re

Petitioner [Identifying Information Redacted by Agency]*, 2008 WL 4051310, at *8 (Dep't of

Homeland Sec. Apr. 7, 2008) ("[T]he petitioner is legally obligated only to pay the prevailing

wage once the beneficiary achieves permanent residency.").  Although Ilaga's assertion that

Plaintiff was receiving the prevailing wage rate in 2018 would add support to Plaintiff's

argument that he was entitled to the prevailing wage rate, there is enough evidence in the record

suggesting that Plaintiff was not yet entitled to the prevailing wage rate to create an issue of fact

for a jury.  Thus, Plaintiff's motion for summary judgment with respect to Section 1589(a)(2) is

denied.

Plaintiff also argues, in a conclusory fashion, that "Anora has likewise presented

affirmative evidence that Defendants Oasis and Beck obtained or provided his continuing labor

or services through a 'scheme' intended to cause him . . . to believe that, if he did not return and

take [on] new assignments, he would suffer serious harm of having his immigration sponsorship

withdrawn and of him being subjected to removal or deportation proceedings."  Dkt. No. 69 at

18–19.  "A scheme, plan or pattern violates § 1589 where it is intended to cause a person to believe that, if she did not perform such labor or services, she or another individual would suffer serious harm."  *Aguirre v. Best Care Agency, Inc.*, 961 F. Supp. 2d 427, 444 (E.D.N.Y. 2013).  The language of "scheme," however, is not sufficient to eliminate all genuine issues of material matter.  Plaintiff has presented evidence of a single instance—related to his refusal to take on new assignments in September and October 2018—where Defendants threatened Plaintiff; Plaintiff has presented evidence of no other indicia of forced labor that would cause him to believe he would suffer serious harm unless he returned to work.  Even if the two distinct statements made by Defendants and their agents could be considered a "scheme" under Section 1589(a)(4), a reasonable jury could find that Defendants' statements were not intended to be taken as, and were not understood as, a threat to deport Plaintiff if he failed to agree to Defendants' work conditions.  *See supra, pp.* 20–24. Thus, there is also a genuine question of fact whether Defendants violated Section 1589(a)(4).

The cases that Plaintiff cites in support of his proposition that Defendants' actions were sufficient to constitute a "scheme" under Section 1589(a)(4) are to the contrary.  None of the cases arose on a motion by a plaintiff for summary judgment and each involved more egregious facts than offered here.  In *United States v. Calimlim*, 538 F.3d 706 (7th Cir. 2008), the defendants engaged in a series of actions designed to keep their victim in their employ.  The defendants took their victim's passport, and, for a period of nineteen years, forced her to work sixteen-hour days, seven days a week, rarely paid her, constricted her freedom of movement, never tried to legalize her presence in the United States, and gave "vague warnings" that they might report her.  *Id.* at 708–09, 713.  The Seventh Circuit thus held that that was "all the jury needed to convict" and that defendants' constitutional challenges to the statute failed.  In *Adia v.*

*Grandeur Mgmt., Inc.*, the plaintiff alleged that the defendants threatened to deport him "while engaging in a scheme whose purpose was to make Adia rely on them in remaining in this country legally, to force him to accept less than the prevailing wage rate based on the threat of facing deportation, and similarly to forestall any effort to seek other employment."  933 F.3d at 93–94. The Second Circuit found that these pleadings were sufficient to state a claim under Section 1589(a)(4).  These cases do not support the conclusion that a single threat of the type made here is sufficient to constitute a scheme under Section 1589(a)(4) as a matter of law, and Plaintiff here has presented no evidence of other indicia of forced labor that would require a reasonable jury to conclude that Defendants engaged in a scheme to obtain his labor.[8]

### B.    Abuse of Law or Legal Process under Section 1589(a)(3)

Plaintiff also argues that Defendants abused the law or legal process in violation of 18 U.S.C. § 1589(a)(3).  Plaintiff points to two actions taken by Defendants in support of this contention.  First, Plaintiff argues that "Defendants abused or threatened to abuse the immigration sponsorship process by advising Plaintiff to have his Form I-485 Application re-filed, despite the fact that said re-filing would no longer result in Plaintiff securing his green card."  Dkt. No. 69 at 20–21; Dkt. No. 72 at 5–6.  Second, Plaintiff contends that Defendants' threat to cancel their sponsorship of Plaintiff's permanent residency constitutes an abuse of the

---

[8] Plaintiff does present evidence that "[o]n at least three occasions, [Ilaga] shouted at Plaintiff over the phone when Plaintiff inquired about his wage rate and the I-140 paperwork[]."  Pl. 56.1 ¶ 63.  However, Plaintiff does not argue, and has not presented any evidence that supports the argument, that Ilaga (and Defendants more generally) intended to cause Plaintiff to believe he would suffer serious harm through this shouting, even viewing it in relation to Defendants' other threats to withdraw their sponsorship.  *See Baldia*, 2022 WL 4777836, at *11 ("Subsection (a)(4) of § 1589 'contains a second scienter requirement,' requiring a showing that the defendant knowingly used a scheme, plan, or pattern 'intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint.'" (citations and alteration omitted)).

legal process.  Dkt. No. 69 at 18; Dkt. No. 72 at 5.  Neither argument entitles Plaintiff to judgment as a matter of law on his forced-labor claim.

Section 1589(c)(1) defines "abuse or threatened abuse of law or legal process" as "the use or threatened use of a law or legal process, whether administrative, civil, or criminal, in any manner or for any purpose for which the law was not designed, in order to exert pressure on another person to cause that person to take some action or refrain from taking some action."[9] 18 U.S.C. § 1589(c)(1).  Although a "threat to cancel [immigration] sponsorship [can] constitute[] abuse of legal process for the purposes of subsection 1589(a)(3)," *Adia*, 933 F.3d at 93, not every such threat exposes an employer to criminal and civil liability.  Rather, the plaintiff must demonstrate that the defendant used the "law or legal process in a manner or for a purpose for which it was not designed."  *Martinez-Rodriguez v. Giles*, 31 F.4th 1139, 1150 (9th Cir. 2022) (examining whether defendants used a visa program in a different manner or for a different purpose than it was designed and thus violated 18 U.S.C. § 1589(a)(3)); *see also Calimlim*, 538 F.3d at 713 ("[T]he immigration laws do not aim to help employers retain secret employees by threats of deportation, and so their 'warnings' about the consequences were directed to an end different from those envisioned by the law and were thus an abuse of the legal process.").  Plaintiff has not demonstrated that Defendants used the green-card process for a purpose for which it was not designed.

Plaintiff first asserts that Defendants encouraged him to file a second Form I-485 Application not "to secure Anora's green card, but . . . [instead] so that Anora would continue to work for Defendants."  Plaintiff points to the fact that there was no possibility his re-filed

---

[9] Because the statute contains an explicit definition of "abuse of law or the legal process," the Court need not "look to New York state law," as Defendants urge.  Dkt. No. 71 at 24–25.

Form I-485 Application would be approved because he had fallen out of lawful immigration status when his first Form I-485 Application was denied.  *See* Pl. 56.1 ¶¶ 80–83; *see also id.* ¶ 84 ("Defendants deliberately misrepresented to Plaintiff that Plaintiff could still secure his green card through the re-filing of the Form I-140 immigrant petition and the re-filing of the Form I-485 adjustment application.").  Encouraging an employee to file a Form I-485 Application—and filing the necessary Form I-140 Petition—solely to obtain the employee's labor during the pendency of a futile effort to secure legal status might constitute an abuse of the immigration process under Section 1589(a)(3).  However, Plaintiff has pointed to no evidence in the record to support his contention that this is what Defendants did; in his memorandum of law in support of his motion for summary judgment, Plaintiff cites to a single paragraph from his declaration, which reads: "Defendants also informed me that I could continue working for them on the basis of my work permit card which had not lapsed yet."  Dkt. No. 67 ¶ 23.  This statement does not establish beyond dispute, if it establishes at all, that Defendants convinced Plaintiff to file a second Form I-485 Application with the sole purpose of obtaining his employment.

Plaintiff's argument fails for a second, independent reason:  Plaintiff has not presented sufficient evidence that Defendants had the requisite scienter to violate Section 1589(a)(3).  Section 1589(a)(3) "requires more than evidence that a defendant violated . . . laws of this country or encouraged others to do the same.  It requires proof that the defendant 'knowingly' abused the law or legal process as a means to coerce the victim to provide labor or services against her will."  *Muchira*, 850 F.3d at 622–23 (citation omitted).  Here, Plaintiff presents evidence that he argues establishes that Defendants "knew . . . that Plaintiff could no longer secure a green card through their sponsorship" and thus that their efforts to encourage him to

reapply were an abuse of the immigration process.  Pl. 56.1 ¶ 83.  He highlights that (1) Defendants knew his B-1 status had expired and (2) Defendants knew that his first Form I-485 Application had been denied.  *Id.* ¶¶ 81–82.  However, Plaintiff must also show that Defendants knew that Plaintiff had fallen out of legal status for a period of at least 180 days and thus was categorically ineligible for a green card.  *See* Dkt. No. 68-18 at ECF pp. 3–4 (citing 8 U.S.C. § 1255(k)).  It is here that Plaintiff's evidence comes up short; Plaintiff is only able to assert based on the evidence in the record that Defendants "knew or *should have known*, from their previous immigration sponsorship experience and from their immigration lawyer" that Plaintiff had fallen out of lawful immigration status and was not entitled to a green card.  Dkt. No. 65 ¶ 80 (emphasis added).  Plaintiff's conclusion that therefore "Defendants *knew*, after the denial of Plaintiff's first Form I-485 [A]pplication, that Plaintiff could no longer secure a green card through their sponsorship," *id.* ¶ 83 (emphasis added), is unsupported by the evidence that Plaintiff has presented.[10]  As a result, it is a question of fact for the jury whether Defendants had the requisite scienter—knowledge—to have violated Section 1589(a)(3).

Plaintiff next appears to argue that Defendants' threat to cancel his immigration sponsorship independently represents a threat to abuse the legal process.  Plaintiff does not

---

[10] Plaintiff cites to his declaration, where he asserts in almost identical language that "Defendants therefore knew, after the denial of my first Form I-485 application, that I could no longer secure a green card through their sponsorship." Dkt. No. 67 ¶ 60.  However, this assertion does not save Plaintiff's argument, because the assertion is not based on Plaintiff's personal knowledge. *See DiStiso v. Cook*, 691 F.3d 226, 230 (2d Cir. 2012) ("[W]here a party relies on affidavits or deposition testimony to establish facts, the statements 'must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.'" (quoting Fed. R. Civ. P. 56(c)(4))); *see also In re Bridge Const. Servs. of Fla., Inc.*, 39 F. Supp. 3d 373, 383 (S.D.N.Y. 2014) ("'[P]ersonal knowledge' includes basic, commonsensical inferences, so long as they are 'grounded in observation or other first-hand personal experience' and are not 'flights of fancy, speculations, hunches, intuitions, or rumors about matters remote from that experience.'" (quoting *Visser v. Packer Eng'g Associates, Inc.*, 924 F.2d 655, 659 (7th Cir.1991))).

develop this argument; rather, in two identical sentences in both his memorandum in support of his motion for summary judgment and his reply memorandum, Plaintiff cites two cases where courts found that threatening to deport an employee represented an abuse of the immigration process. *See* Dkt. No. 69 at 18; Dkt. No. 72 at 5.  For Plaintiff's argument to have any force, Defendants' threat to cancel their sponsorship unless Plaintiff returned to work must be a "purpose for which" the immigration process for EB visas was not designed.  This argument, however, is undermined by the reality of how the EB immigration process functions.  "Most prospective EB immigrants adjust status while residing in the United States and are already embedded in the U.S. labor market, often working for their sponsoring employers."  William A. Kandel et al., Cong. Rsch. Serv., R47164, U.S. Employment-Base Immigration Policy, Executive Summary (2022).  This dynamic in turn tethers immigrant employees to their employers during the pendency of their application; EB immigrants can be "[f]orced to either remain with their employers or sacrifice their pending petitions and their place in the EB queue, they remain vulnerable to potential exploitation."  *Id.* at 26.  Recognizing some of the potential drawbacks of these dynamics, Congress passed the "portability" provisions of the American Competitiveness in the 21st Century Act of 2000, 8 U.S.C. § 1154(j) and 8 U.S.C. § 1182(a)(5)(A)(iv).  *See Mantena v. Johnson*, 809 F.3d 721, 724, 734 (2d Cir. 2015); 146 Cong. Rec. H8699–01 (daily ed. Oct. 3, 2000) (statement of Rep. Lofgren) (noting that these provisions "allow[] for portability of H-1B status as well as portability of I-140s and labor certifications").  These provisions permit an applicant with an approved Form I-140 Petition to switch to another job in the same or similar occupational classification if her Form I-485 Application remains outstanding for at least 180 days.  *See* 8 U.S.C. § 1154(j).  In doing so, Congress recognized that a defining feature of the then-existing EB immigration system was that applicants were bound to

their existing employers during the pendency of their Form I-485 Applications and developed a carveout for long-delayed Applications.  Thus, contrary to Plaintiff's implicit assertion, it is a feature of the EB immigration process, now circumscribed by the portability provisions, for many immigrants that they remain employed by the same employer during the sponsorship process.  If Plaintiff can demonstrate that he was entitled to the prevailing wage rate or that Defendants required Plaintiff to engage in activities outside of his legitimate job duties, then his argument would have more force under the cases he cites; it is not, however, an abuse of the immigration process for an employer to require that an employee continue to work—under agreed-upon and legal wages and conditions—while her Form I-140 Petition remains unadjudicated.

## II.    Trafficking Claim under Section 1590

Plaintiff also argues that he is entitled to judgment as a matter of law for his trafficking claim under Section 1590.  Section 1590 prohibits "knowingly recruit[ing], harbor[ing], transport[ing], provid[ing], or obtain[ing] by any means, any person for labor or services *in violation of this chapter*."  18 U.S.C. § 1590(a) (emphasis added).  Plaintiff's Section 1590 claim is premised on Defendants' violation of Section 1589(a).  Because Plaintiff has not established that he is entitled to judgment as a matter of law with respect to his Section 1589(a) claim, he is not entitled to summary judgment on his Section 1590 claim.  *See Martinez-Rodriguez v. Giles*, 31 F.4th at 1149 (holding that a Section 1590 claim premised solely on a Section 1589(a) claim "rests dispositively on whether Plaintiffs have presented sufficient evidence to establish all of the elements of a violation of § 1589(a)"); *see also Fawemimo v. Am. Airlines, Inc.*, 2017 WL 398387, at *1 (S.D.N.Y. Jan. 30, 2017), *aff'd*, 751 F. App'x 16 (2d Cir. 2018) (noting that at the

31

summary judgment stage "the evidence *on each material element* must be sufficient to entitle the movant to relief in its favor as a matter of law" (emphasis added)).[11]

## CONCLUSION

Plaintiff's motion for summary judgment is DENIED, and Defendants' cross-motion for summary judgment is DENIED.  The Clerk of Court is respectfully directed to close Dkt. Nos. 59 and 66.


SO ORDERED.

Dated: March 1, 2023
        New York, New York

_____
LEWIS J. LIMAN
United States District Judge

---

[11] Because the Court has found that Plaintiff is not entitled to summary judgment on either of his TVPA claims, it need not examine Defendants' asserted affirmative defenses: Plaintiff's failure to mitigate damages and the fact that Section 5(a) of the Employment Agreement contains a hold-harmless and release-of-liability provision related to Defendants' immigration assistance. *See* Dkt. No. 71 at 29–31.